## Alkire v. City of Denver.

*District Court of Arapahoe County, March 3, 1902.*
*No. 33,730.*

J. B. Bissell and L. M. Goddard, for petitioners; H. M. Orahood and H. L. Ritter, for respondents.

CARPENTER, J.

This is a bill to enjoin the Board of Public Works from letting a contract to pave a portion of South Fourteenth street in the city of Denver, Colo., with basalt. The bill sets up a number of grounds for invoking the aid of the court. One of them is that it was the purpose of the Board of Public Works, as appeared by their advertisement and by the transaction which preceded it, to let a contract to pave this street with basalt taken from the Valmont Butte quarries in Boulder, the claim being that specifications worded in this way had the effect of preventing competition. Another of the grounds set up is that there had been, some time subsequent to the declared purpose of the board to let such a contract, a remonstrance filed which represented a majority

of the frontage in feet. Another ground is that the guaranty required by the specifications is burdensome beyond that permitted by the charter; that is, the guaranty for repairs for a period of five years. Another is that one of the specifications requires that the dirt to be removed from the street shall be hauled a distance of three thousand feet, at the discretion of the Board of Public Works, and deposited at such places as they may in their wisdom indicate, whether it be one hundred or three thousand feet. That is not the statement of the petition, but that is the substance of it.

Another one that is incident to that is that the Board could repair other streets, deposit this material to the benefit of other inhabitants of the City of Denver at the expense of the property owners on South Fourteenth street; that had not this requirement been made with respect to this dirt the contractor might have disposed of it and thus lessened the cost to the property owners along the street.

It is said by the defendants that the specification requiring Valmont basalt is not such as to contravene the provisions of the charter with respect to competition, and reliance is placed upon the case of Rhodes v. Board of Public Works, 10th Colo. App. 99, as well as upon other cases, which were cited, some of them at least, in this Rhodes case.

I have examined the Rhodes case with diligence and care, because if that case has the force which the defendants contend that it has, it would be controling upon this court and would dispose of that branch of the controversy, which seems to me to be one of the important matters, if not the most important matter, presented by this bill. The pro-

vision of the charter which was brought in question in that case is that found in the third sub-division of Gen. Sec. 160 of the ordinances of 1898 (charter of Denver, compilation of 1898, p. 74, L. '93, p. 203), in which it is stated that in every instance the material shall be so described in the specifications, either by standard or quality, as will admit of genuine competition between contractors, so that there can be at least two or more bids of individuals or companies in no manner connected with each other. I may say that, in my judgment, this case of Rhodes v. Board of Public Works, *supra*, a conclusion reached as I have stated from a careful examination of the opinion, does not control in this case, as will be seen, I think, when I have stated somewhat more of the contents of this bill. In the Rhodes case there was a petition filed to pave a portion of a street in this city with Trinidad Lake asphalt, and the Board of Public Works having expressed the opinion that to proceed in the matter would bring them into opposition to the charter, declined to proceed, although the requisite petition with respect to the property to be charged had been filed. Thereupon Rhodes brought an action to obtain a writ of mandamus to compel the Board of Public Works to proceed. To that petition or to the alternative writ, I do not now recall which it was, a demurrer was filed, and the case was determined upon that demurrer. I think the following passage from the opinion is of considerable significance: at page 110 the court says: "But in behalf of the Board the argument goes beyond this. Its theory is that if the paving material named in the petition was owned and controlled by a single person or company, there

could be no competition, for the reason that others who might desire to compete for the contract could not do so, because the material would not be within their reach; and, accordingly, it is said that it must appear in the petition for a mandamus, that the designated material could be the subject of competition in the sense that different bidders would be able to obtain it. We think the presumption is that every article of commerce is within the reach of any person who desires it, and is able to pay for it; and therefore, that an allegation that Trinidad lake asphalt could be obtained by the bidder to whom the contract should be awarded was unnecessary. But even if it was the fact, as counsel intimate,—and we have nothing but their word on the subject,—that this asphalt was controlled by some men or combination of men, we are not prepared to say that, therefore, the persons interested may not lawfully petition for its use as paving material."

It seems to me, with all due deference to the able jurists who composed the court of appeals at that time, that they might have stopped right there in this opinion, or rather a little before, because there was nothing in the petition in that case, and there was nothing before the court, to show that Trinidad lake asphalt could not be purchased by anybody in the market. But if the Board of Public Works had answered in that case instead of having demurred, and had set up that Trinidad lake asphalt was owned by one particular company and controlled absolutely by that company, and that that company was engaged in the business of paving and would not sell its material to other people so as to permit of competition with the company, I think that there would have been

a different result.

In this bill for an injunction, it appears that the owners of the Valmont-Butte quarry are engaged in the paving business, are paving contractors, and enter into competition for this class of business; and subsequent events proved that they did enter the field for the purpose of obtaining this contract. It needs no argument to show that other bidders would not occupy a very good position competing with the people who owned the quarry. That appears in this bill. It also appears in this bill that there are other basalt quarries in the state of Colorado, and that it is a common geological formation here and can be obtained in very many places of just as good quality as can be obtained at the Valmont-Butte quarry. There is particularly mentioned one quarry in Jefferson county, where it is said that if there is any difference in the material at all, the grade is higher than that of the Valmont-Butte quarry, and that this can be obtained at the rate of 90 cents per ton at Denver. When the contractors intending to bid for the South Fourteenth street paving approached the Valmont people for the purpose of getting their price for Valmont basalt, so that they might bid intelligently upon this contract, they were informed that it would cost them two dollars per ton at Denver.

It seems to me, therefore, that the Board of Public Works is proceeding in this matter directly in the face of the charter.

Another thing that is stated in the opinion of Rhoades v. Board of Public Works, *supra*, without analyzing it to its full extent, is that it seemed to be conceded that Trinidad lake asphalt was superior to all other asphalts, that it stood in a class by itself,

and that if the people desired to get this higher class material, they were entitled to it. I think it was unnecessary for the court of appeals to have discussed that phase of the case at all, but they did do it, and even looking at it from that standpoint, the assumed case of the court of appeals, if I may say it, there is nothing in that case, it seems to me, that can control in this under the allegations of this bill.

It seems to me that it cannot be justly said that where there are two quarries in the same bed of basalt, one belonging to A and one belonging to B, the Board of Public Works may say that the material shall be taken from the A quarry instead of the B quarry, and thus put it in the power of the A quarry to dictate the price. It might just as well be said that sand should come from east of Broadway bridge instead of west of Broadway bridge.

It was said in the argument that the people petitioned for Valmont basalt, and they were entitled to have it. Possibly that is true, if the petition was unanimous, but the 49 per cent have some rights, and I do not agree to the proposition that 51 per cent. of the property holders can compel the other 49 per cent to pay two dollars per ton for what they could get just as well at ninety cents because the 51 per cent have seen fit to designate a particular quarry, or a particular article which is no better, as it appears by this complaint, than the other.

With respect to the petition of remonstrance, while I have no doubt of the proposition that the charter contemplates that property owners who may have signed for paving may repent and withdraw their names if it is done within the time limited by law, it does not appear by this bill, as I read it, that

this remonstrance was presented to the Board of Public Works within the time which the charter intends that it should be.

With respect to what is spoken of as the guaranty clause or specification in the proposed contract, the charter provision (L. '93, p. 203) is that the specifications may provide that the bidder shall agree to enter into a contract to do the work and maintain the same in good repair for a period of five years. The guaranty clause proposed for these specifications, to my mind, goes very much beyond that charter provision. Not only does it go beyond the charter provision, but it provides that it shall be absolutely within the discretion of the Board of Public Works as to when these repairs shall be commenced and as to whether or not the pavement may be wholly reconstructed. Without undertaking to pass upon the proposition conclusively, it has impressed me very strongly that that clause in the specifications is such as to at least make it of very doubtful validity, for the reason that it leaves it open to the Board of Public Works to show favoritism, and that is universally condemned in all public contracts. It is within the power of the board to make it hard for one and easy for another, and whenever the board draws its contract upon that theory, no matter how honest its purpose may be, as I understand the decisions, it is bad. There must be no room left for any favoritism to be shown.

With respect to the three thousand-foot haul, which is another point that has been urged in this bill, it does not seem to me that the fact that the Board of Public Works may direct that this material shall be deposited in a particular place would be ob-

jectionable so long as it was reasonable. That is the way it impresses me now. I think the trouble about the clause is very largely that it puts it within the power of the Board of Public Works to make it hard for one contractor and to make it easy for another. However, it is not necessary to pass upon this, as in fact it has not been really necessary that I should pass upon any of these propositions after having passed upon the first one.

I think the bill states a good cause of action on behalf of the minority owners, and for that reason the demurrer is overruled.